And we will move on to our third case for this morning, Baugh v. Cuprum. Ms. Murphy Petros. Good morning, Your Honors, and may it please the Court, Melissa Murphy Petros for the defendant, Appellant Cuprum. With all due respect to the District Court, this case is not about a battle of the experts.  Can you point me to the place in the record where you explicitly said to the District Court, we don't think that the plaintiff's experts should be permitted to testify pursuant to Evidence Rule 702 or pursuant to Daubert, or however you wanted to phrase that, and given the District Court a chance to review both the background of those experts and the methodologies they proposed to bring to bear? Yes. Mr. Smith and Vincent's testimony was first... So it wasn't done beforehand in any kind of motion in limine? It was done in motions in limine, yes. To bar the experts altogether? Yes. Defendant's motions in limine No. 5, 15, 16, and 25, and this is at... And how specific were you about qualifications and expertise, I'm sorry, and methodology? They were very specific. The arguments are essentially verbatim to what we set out in our opening appellant's brief with respect to the fact that these experts' testimony do not meet the reliability criteria set out. Did you ask the judge to appoint a neutral expert? I'm sorry, sir? Did you ask the district judge to appoint a neutral expert? You know, Rule 706? Yes. The record does not reflect that that was done. Well, you should have. So my problem is I can easily... Because this is a case, this horrible accident to this person in which the jury is going to be sympathetic to the plaintiff, and one way you can neutralize that is by having a neutral expert because a neutral expert is more credible to a jury than a party expert. So I'm just puzzled why lawyers so rarely ask the judge to appoint a neutral expert. The other thing that's puzzling is there are references here to the company having improved its ladder, made it safer after the accident, and that's in the record. Now, why didn't you object on the basis of Rule 407? The references, the testimony I think that you're referring to is the testimony of Mr. Tom Schmidt from Kupram. He testified that the ladder design with respect to the gusset was changed after the accident, but not for safety purposes. It was changed, it was an industry-wide change that we were asked to make by the sales and marketing department that improved the ladder's durability during shipping, handling, and transport if it were to fall on its side, for example. There's no evidence. So you're saying these changes had nothing to do with safety? Mr. Schmidt was not allowed to answer that question. A plaintiff's objection was sustained that the answers to that question would have been hearsay. I'm surprised Mr. Schmidt went into the topic. What does hearsay have to do with it? I don't understand that. I don't understand it either. I agree you should have been allowed to answer the question. It was from which a jury could infer that the company made some effort to make the ladders safer. Now that's precisely the sort of evidence that 407 precludes. Rightly so, because otherwise, I mean, that's the whole theory of it is if you allow an evidence about repairs or other safety efforts made after the accident, then these companies will never make repairs. Who had introduced Mr. Schmidt? Mr. Schmidt was called as an adverse witness by the plaintiff, and he did testify in the defense case as well. Did you object to the fact that he was testifying about this change at all, or was your only objection the fact that he couldn't explain the reason for it? Well, he did explain the reason for it partially. What I'm saying, when they start going down the path of was there a change in design, did you or any, obviously I don't mean to be personalizing this, but did the Kuprem lawyers object to that topic being raised? Yes, absolutely. So we don't want him to talk about any changes being made. Yes. See Rule 407. Yes, absolutely. And for the reasons that Judge Posner mentioned, it certainly leaves the implication, like for example with Mr. Schmidt, he was allowed to testify to the industry-wide change and the reason for that, but was not allowed to further state whether or not safety played a role in that change. But on appeal, you haven't made the broader argument that Schmidt's testimony should have been deleted altogether. The only argument you've made is that he should have been able to say more. Yes. And, in fact, the objection that was sustained to Mr. Schmidt's testimony was inconsistent with the district court's ruling on our motion in limine number 18. That motion was granted, and it precluded evidence that Kuprem changed the top cap of the ladder from an aluminum top cap to a plastic top cap after the accident. It was granted for the very reason that if the jury heard evidence of ladder changes, they could infer that that was done for a safety purpose when, in fact, it was not. So I want to go back to the experts for a minute because I'm mystified that you think that the district court abused his discretion by saying that mathematical proof of the kinds of stresses that were being imposed on various points of the ladder, and in particular, I was very happy to have these pictures at the back of your brief, looking at A12, the stresses there. I don't know why mathematical calculations are not entirely appropriate to see what kind of stress would produce that bending. Our position is certainly not that mathematical analysis can never constitute testing as a general matter. Good. All right. So that's tip one. Right, and we set that out in our reply brief as well. Our position here is that the mathematical analysis conducted by Dr. Vinson in this case is insufficient. Why? And unreliable because it was incomplete. What was wrong with it? Because you have this preposterous theory that somehow when he fell on the ladder, his body caused this bend to happen, and that seems as though it's a theory and the jury could weigh the theory, but the jury might be persuaded or not persuaded that a man falling on a ladder could cause this little couple of inches to sheer in abruptly. You would think if a man fell on a ladder, it wouldn't look like that. Well, to your point with respect to Dr. Vinson's mathematical calculations, first of all, Dr. Vinson's testimony is very clear. He examined the engineering drawings for only the right foot and gusset area, which you're looking at on that photo. Which was the part that failed. But everyone agrees, including Dr. Vinson, that weight and force on a ladder are distributed throughout the entire structure. He did not mathematically analyze the entire structure. But he didn't need to. He's talking about how much force was necessary to cause this, I'm calling it sheering, called the bend, that way. But he did need to. I'm sorry. Why? I don't get it. I can understand. Well, he certainly did need to because, again, he agrees that when a person is on a ladder, the force and the weight is distributed throughout the entire structure. So if the force didn't distribute down to that part, it wouldn't have bent. Well, but he needed to look at the whole ladder and not just that part. And, of course, he was cross-examined on that. He was. He was. So really, your objection has to do with his methodology and saying that it was not reliable. But that was all presented to the jury, right? It was presented to the jury, but the district court did not do a Daubert analysis at the outset. That's why I'm asking, how clearly did you tee this up for the district court? It looked to me like it was done on the fly at best. It was not. Page 51 of our brief, we have the record citations for the motions in limine. Numbers, as I said, 5, 15, 16, and 25. And those motions specifically called for a Daubert determination? Yes, they do. And they rely on the cases that we are relying on in our brief. Bielski's and other opinions of this court holding that when reliability is challenged, you have to look to see in alternative design cases. But you've admitted that from a methodological point of view, mathematical analysis, essentially an engineering analysis, is an acceptable way to go. And as for the rest of it, why doesn't that just go to the weight and cross-examination and let the jury either think that this alternative methodology that your experts used was, I mean, a jury could have thought it was better. I don't think anybody said it was. Indeed, even Vincent said you could do it that way, but he didn't think you had to do it that way, this finite element analysis I'm talking about. Well, certainly, just to clarify my admission, I'm not admitting that Dr. Vincent's mathematical analysis was reliable. I maintain that it was not. But that's because you think he didn't execute it right. But you're not saying that in general, it's not like consulting an astrological forecast or something. People can do mathematical analysis. They don't have to limit themselves to computer simulations. They don't have to limit themselves to accident reconstructions. Agreed. But I would also point out, even assuming that his mathematical testing was a reliable method of testing, he still has to show, plaintiff, that Dr. Vincent's alternative design was peer-reviewed and accepted by the relevant industry, the latter industry. But no, you don't. I mean, you know, the Supreme Court got away from that in the Kumho-Tyre case. The original Daubert case, of course, is just the foundation for Rule 702, which is the rule that governs these things. And Rule 702 doesn't say anything about peer review. Well, no, this Court's decision... Why is acceptance by an industry important? Acceptance by the industry is important to show... I mean, they're trading off safety against, you know, their revenues. It's an important industry. So they may decide, well, you know, we'll have an industry standard. It's not going to be the most rigorous standard because we have to trade off protection against our income. I'll answer your question, then I'd like to save the rest of my time. It's an important indicator of whether or not the alternative design is safe, practical, and economical. Well, that's what I don't see. That's what plaintiff has to show. That's what I don't understand because the industry has more on its mind than safety. Well, I would disagree. I think in the latter industry, safety is very much on... Why would you disagree? Don't you think the industry cares about its income? I think safety is absolutely on the minds of the latter industry. Well, what's the evidence for that? Is there evidence? For the general... Yes, Mr. Schmidt testified that for Coopram, he has the corporate representative, that safety and safe use of ladders, et cetera, is very, very important to the industry. So, again, the industry acceptance is a factor that the courts look at.  The weight is equally distributed throughout the ladder? It's distributed throughout the entire structure of the ladder. I don't get that. What if he's leaning one side? Then the weight is going to be concentrated on one side of the ladder. It's not going to be evenly distributed throughout the ladder. I don't know that it's always evenly distributed. Dr. Stevenson explained this in his testimony, but it is distributed throughout the structure of the ladder. It may... Well, so what? I mean, if he's putting... He's a heavy guy, right, 220 pounds. If he's leaning on one side, if his weight is on his right foot or something like that, that's going to put more pressure on the right-hand side of the ladder. And all of those scenarios are tested through finite element analysis. I would like to save the rest of my time. You need to answer Judge Foster's question. Oh, I'm sorry. I have another question for you. Sure. Do you mind? Not at all. I'm sorry. I thought you were done. So what are the videos? I looked at the video. What are they supposed to show? The videos demonstrate our causation expert, Mr. VanBreeze, opinion as to how he believes the accident occurred. So those were used in his testimony. But what I gathered was that this fellow, fortunately holding onto a rope, that what he did was, what, he sort of kicked the thing? Well, he certainly deliberately misused the ladder. So he dangles? Yeah, that's his opinion as to how, working from the damage to the ladder, his opinion is that plaintiff misused the ladder in a couple different ways, climbing too high, standing on the pale shelf, and climbing with his back to his work area. So he was demonstrating. But this was entirely speculative. I mean, we don't know when the pale shelf got kind of caved in. It could have been long before that day. And it does require sort of a contortionist approach as opposed to the plaintiff's theory that the ladder was just put up against the gutter so that he could take out the screws. And then we have the whole issue of the dirt and vegetation that was not found on his clothes because your expert suggested he fell into the flower bed, and there's no evidence of that. Yeah, that is correct. And, you know, on causation, as we're talking about it, you know, under Illinois law, when there's no direct evidence of causation, and that we all agree on, and we're relying only on circumstantial evidence, it is plaintiff's burden to show that his theory of the accident is the single most probable conclusion. But the plaintiff only has to show that by a preponderance of the evidence. But nevertheless, the single most probable conclusion. Right, and so no dirt, strange position. Anyway, I think we have the points covered. So thank you very much. Thank you. Mr. Wise, I will give you a minute after Mr. Wise since we asked you a lot of questions. Good morning, Your Honors. May it please the Court, if I could make one comment on some of the statements made by counsel with respect to the I see this, a lot of this case, to be a bootstrap argument of the credibility and weight of the experts into an admissibility argument that was actually never made. So that's why I'm asking this question. Ms. Murphy-Petros has stood here and said, absolutely, through these motions in limine, a proper, as people like to call it, a Daubert challenge, Rule 702 challenge, was made to both the qualifications of the expert and the methodologies, let's say 702D, that the expert reliably applied those principles in the case. And now you're saying no. It was absolutely not done. And the motions in limine that are being referenced, 5, 15, 16, and 25, are found in the record at Document 147. Those are the motions in limine filed before the first trial. Judge Korr, to be fair to Judge Korr, the only issue raised relative to Dr. Vinson's testimony was that he didn't test, and I suspect this means hands-on testing, which I'll speak to in a moment, that he didn't test his theory. And just to nail this down, and I took this from the briefs too, the rulings on your experts really just moved forward from one judge to the next. So they start with Judge Korr, they move to Judge Pallmeyer, Judge Lee accepts them, and nobody ever renews anything before Judge Lee. Correct. Correct. And Judge Korr had not only the motion, but the depositions were given, which are 180-200 pages apiece with about 20-some odd exhibits. So he did have all that when he made his ruling. His ruling was the motion was very narrow on why the defense wanted not the witnesses barred, but a particular piece of testimony barred. So you understood that to be a concession that Vinson and the other fellow were indeed qualified as experts and entitled to testify as experts. I do think that is that concession. And there was never a motion to strike made in my trial, the second trial, there was no motion to strike made their testimony after it was testified to or a directed verdict or anything of that fashion. So Dawberg's not even mentioned. Do we know how far he fell? We have an estimate about five feet. There was testimony in the record elicited from one of the doctors by defense counsel that he said before he lost his ability to communicate, Mr. Bowe testified that he stated to the doctors he fell about five feet or the early responders. And so what rung of the ladder would he have been standing on? Well, it depends on how, to be honest with you, it depends on what he meant by five feet. Five feet, his head off the ground or middle of his body. So we don't know whether it was the third or the fourth? We don't. What we had Dr. Vinson do is check the math, determine whether or not the overload would occur regardless of what step he was on. And the answer was it would occur on any of the steps, given the location of the gusset and the thickness of the side rail. Your Honor, you made a point a moment ago, and I'll speak to it, and in fairness I think it should be answered. Why was there some testimony about the change in the gusset? The testimony in the top cap counsel made it seem as if there was an inconsistent ruling, and I think there was not. And I'll say the two things that I think speak to that. One, the change in the gusset was made before the accident occurred. And there is some case law, and memory serves in this circuit and others, that if the change is made before the accident occurred, it can be admissible. Issue two, they did not challenge the admissibility of it. I understand that. And then with respect to why Mr. Schmidt wasn't permitted to talk about why they changed it. First, I think it's irrelevant why they changed it, because it did have the effect of strengthening the lower gusset. But also importantly, Mr. Schmidt never disclosed that. He was deposed as a corporate witness for Cupram. He didn't work at Cupram when the change was made. He didn't know why the change was made during his deposition. When he was put on the stand, I put him on the stand in my direct as an adverse witness. When the defense brought him back in the defense case in chief, they wanted to elicit this reason of why the gusset was changed. So we had an objection sidebar. We said, first, how does he know? And second, you never disclosed he was going to say this. And in a sidebar with Judge Lee, Mr. Schmidt was brought over and voir dired and asked, how do you know this? He said, well, I just called some people at Cupram and asked why they did this back then. And it was considered to be hearsay, and he had no documents or anything like that, and not disclosed. So that's why it was excluded in his explanation that it not being a safety. And as to causation, how do you respond to Cupram's argument that the latter's offset to the right is a signature of a tip-over event? Our experts, this is, I made this comment at this point in my brief about this binary argument, this binary theory, which I think is not that common in some of these circumstantial evidence cases. It seems like the cases, and I'm not evading your question because I'm going to get right to it, but there's always a missing piece of evidence, like how did the boy fall in the pool? Did the child see the truck driver wave him across? Here, we know there are only, and all the experts testified to only, in the entire universe of possibilities, two setups for the latter. Ours is the normal setup, the tip-over to the right being consistent with the evidence and the outward thrust. So in yours, just to pause for a second, you think the latter has the steps going away from the garage, the backside of the latter there, the gutter screws that he's trying to fix are in front of him, and he's got a, whatever it is, a Phillips screwdriver that he's using, and then he falls, and the latter, that leg of the latter on the right side buckles under, and the latter itself falls over, and both of the neighbor witnesses say they saw the latter with that right side down on the pavement. Precisely. So with the latter damaged and the witnesses, that corroborated to a forward setup. So the defense says we have a reverse theory, and the reverse theory was that it's set up, obviously, climbing away from the house, you'd be working over your back and farther away, and when asked, well, what's the basis for that opinion? The testimony was we can, the video shows some of this. We'll drop a weight, and that weight damages the leg in the fashion scene in the artifact latter, and they said, well, that could be him hitting it. Then there's a damage to the right front leg, and they said, well, that would be it. What did the weight look like? It's a sandbag. But not like a full-grown man's sandbag. No. So they put these evidence, Mr. Van Bree did most of this testimony, they put him on the stand, and he explained sequentially how to bend the latter and dent the latter. And then he got on the latter, and then he straddled the tail holder and the other rung. The top step in the tail shelf. That's what's shown in the video. Right, and I said, so the plaintiff has to do that in order for your theory to all pan out. He said yes. He was a 64-year-old man at the time? A 64-year-old man. And he had an 8-foot latter in the garage. In addition, there were other things that all added up against that theory. One is that if he put it in the garden, he probably couldn't even reach the gutter at all. So why would he put it in the garden when he could put it on the driveway facing normal the way we would normally do it when he could lean up? And Mr. VanBree testified to this. If you are forward and you lean up, you can reach with a screwdriver, whereas if they did it his way, he probably couldn't reach. So you need to take into account the fact that the screwdriver's got an extra couple inches on it, because I guess, was it Mr. VanBree who said, who's a little bit taller than Mr. Baugh, that he could just barely reach the gutter? He could touch it with his fingers. He could touch the gutter screw. If you're holding a screwdriver, you've got an extra three or four inches. So what I think with respect to what we're discussing here, the causation argument, it has to be one of these two ways. And then with, I believe, the expert or all of the evidence, the testimony of the experts and whatnot was properly admitted, now the jury looks at this and it becomes a question of fact. Which of these two is more likely true than not true? That was my burden of proof, I think, all the way through, regardless of whether it's a circumstantial evidence case or not. So if there's anything else, I don't... Yeah, I mean, this really does seem to get down to the expert testimony. I think that's the core of your opponent's arguments. What about this duty to make this, in a sense, the only way it could have happened? I don't have the burden of proving it's the only way it would have happened. I have a burden of proving that that's the most likely way and that the evidence leads to that conclusion. And I don't have to rule out other possibilities in my burden of proof. Given that there's only two possibilities, the way I think the evidence came in in this particular case, if the jury, and rightfully so, concluded it didn't happen the other way, then it did happen this way. So there are other things in this case. There's kind of some additional arguments your opponents make, including what they're calling the per diem statement and the closing argument. I made an argument, I think it was in rebuttal, not positive, but that the amount of dollars that this future medical was going to cost, and I divided it over years, which I don't believe is a per diem violation. You already had the number in, though, right? The number was in. Through an expert. The number was in through expert. It was uncontradicted. It was crossed. But there was no other life care plan put in. They had no life care plan. So you had some number for the life care plan. And so your position is you were just saying, and here's another way of looking at this number, it makes sense if you think of it as a per year cost of maintaining this guy. He's in an assisted living home. And the jury awarded precisely the amount that the expert suggested, and we selected, of the two options. The less expensive of the two is reasonable damages, and that was the number the jury awarded. So if I did make a mistake, I don't think I did, I don't think it made a difference. But the jury instruction does talk about the amount of years going forward and the amount of damages for those numbers of years. So I thought the argument was proper. And the Cayley case that they mentioned is a per diem per day, and that's. Right. That's not the same. Okay. Thank you, Your Honor. All right, thank you very much. So I say I would give you one more minute, Ms. Murphy-Petros, to make any final comments. Thank you. I did want to give you a record citation with respect to the motions in limine. The rulings did carry forward, as counsel stated. So we're all talking about what Judge Korr said. Yes, from Judge Korr to Judge Pallmeyer to Judge Lee. We did renew those yet again at the outset of the second trial and even before Dr. Vinson testified. And that's at document 403, pages 115 and 116. Okay. And in terms of the rulings, because the rulings were pretty terse, there was never a request by your client to fully address the Daubert standard. Our client maintained that request throughout. From the motions in limine phase at the first trial, then again at the beginning of the second trial at the motion for directed verdict, we asked for a Daubert analysis. And then again after the verdict came in in our post-trial motion for judgment as a matter of law. And so the word Daubert was used? The word Daubert, the rule 702, yes. They were consistently challenged on that basis. And as you rightly point out, the rulings, in our opinion, did not perform the correct analysis. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.